**UNITED STATES of America, Plaintiff**

v.

**THE MUNICIPAL AUTHORITY OF UNION TOWNSHIP; and Dean Dairy Products Company, Inc. d/b/a Fairmont Products, Defendants**

**No. 1:CV–94–0621.**

United States District Court, M.D. Pennsylvania.

Dec. 31, 1996.

---

Lynn Penman Dodge, Environmental Enforcement Section, Lois J. Schiffer, Acting Assistant Attorney General, Environment & Natural Resources Division, Washington, DC, Robert R. Long, Jr., U.S. Attorney's Office, Harrisburg, PA, for U.S.A..

Joseph E. Sikorsky, Lewistown, PA, Gary B. Cohen, Law office of Gary B. Cohen, Washington, DC, for Municipal Authority of Union Tp.

Gary A. Peters, Steven C. Kohl, Howard and Howard, Laura A. Talt, Howard and Howard, Bloomfield Hills, MI, for Dean Dairy Products Company, Inc. dba Fairmont Products, Inc..

### MEMORANDUM AND ORDER

RAMBO, Chief Judge.

Pending before this court is Fairmont Products' ("Fairmont") motion for amendment of the findings of fact and conclusions of law, for a new trial, for relief from judgment or for reconsideration. Fairmont's brief in support of its motion addresses several issues which it believes requires revision to this court's memorandum and order directing Fairmont to pay $4,031,000 in penalties to the United States for pretreatment violations of the federal Clean Water Act. The only issue this court will address is the economic benefit issue.

This court determined that Fairmont realized $417,000 in economic benefit annually between the period of July 1989 and April 1994. The basis for this conclusion is Joint Exhibit 18 (Bates No. 378), which this court concluded was a projection of the impact on earnings for Fairmont if it reduced production necessary to achieve compliance with its IU permit.

Fairmont argues that the United States first asserted its "wrongful profit" theory of economic benefit, based on Joint Exhibit 18, during its closing argument at trial (Trial Transcript ("Tr.") at 570–571), and that Fairmont had no meaningful notice or opportunity to submit evidence refuting the United States' assertion. Fairmont also argues that the figures in Joint Exhibit 18 represented gross figures and that testimony from Ronald Crock was necessary to explain the figures set forth in that joint exhibit. It is Fairmont's position that the $417,000 figure set forth in Joint Exhibit 18 does not represent the actual cost or total impact of loss of Penn Maid volume. Fairmont asserts that Ronald Crock was subpoenaed by the United States but was never called to testify to explain Joint Exhibit 18.

Fairmont further argues that the United States stipulated that Fairmont realized no economic benefit from Fairmont's five-year delay in capital and operating expenditures necessary to achieve consistent IU permit compliance. (Stipulation of Parties dated January 29, 1996.)

■ The record reflects that Fairmont had notice of the wrongful profit theory of economic benefit prior to trial. The first notice of this theory appeared in the United States' pretrial memorandum filed December 27, 1995, which states, in pertinent part:

Moreover, the United States will establish that Dean was operating its Fairmont

plant at a percentage over capacity, thus increasing its profits at the expense of violating the Clean Water Act. The economic benefit, separate from the capital costs, was substantial for each year of production. Thus, non-compliance with the Clean Water Act permit was very profitable for Dean.

(United States' Pretrial Memorandum at p. 14.)

Further notice appeared in the trial brief and opening statements. Contained in the United States' trial brief is the following passage:

> Finally, the United States believes that Dean enjoyed financial benefits during the period of noncompliance. Its production operations were neither halted nor adversely impacted by its noncompliance. Instead, production actually increased at the plant with respect to significant items in its overall product menu. Dean continued to collect revenues and make sales based on products manufactured at the dairy. The increased revenue to Dean as a result of its failure to decrease or halt production to maintain compliance with the Act could be gleaned, for example, from the average percentage of Dean's exceedances applied to Dean's revenues for the Fairmont plant. In other words, how much "extra" was Dean able to produce by exceeding its permit limits, while its competitors were constrained in production and in compliance with the Act.

(United States Trial Brief at p. 8.)

In its opening statement, the United States again discussed this economic benefit:

> A third factor that the court must consider is economic benefit, if any, to the violator. This is typically seen as a floor to the penalty. That is the penalty should never be less than the economic benefit; otherwise, a violator would be further ahead violating than complying.
>
> Here Dean benefitted in two way[s] by its violations. First, Dean benefitted by delaying the expenditure of capital on the pretreatment system. In essence, it made money on the money that it didn't spend by installing the pretreatment system. Second, Dean benefitted by being able to produce more by exceeding its permit limits. Simply put, more production equalled more revenue. The United States will present evidence showing what Dean itself estimated as the amount of revenue it would lose if it decreased production to levels that would comply with its permit.

(Tr. at 46–47.)

Even though a stipulation was entered with regard to no economic benefit in capital terms, the United States still preserved its claim to other economic benefits gained by Fairmont.

> MR. LONG: We will read that into the record. Essentially, it is this, Your Honor: That we are stipulating that by virtue of the installation of hardware by Dean at the Fairmont plant—and we have listed out the hardware items in the stipulation—that neither the subsidiary Dean Dairy—and I am encapsulating the overall stipulation, Your Honor—neither the subsidiary[,] the Fairmont Division or Dean Foods enjoyed any economic benefit from avoiding the costs associated with installing this hardware or by delaying the capital expenditures necessary to bring this hardware online at the dairy plant.
>
> And by virtue of this stipulation, Your Honor, we do not need to call Mr. Fagan in our case-in-chief, nor will Dr. Wise or Mr. Ammann testify in the defendants' case-in-chief.
>
> THE COURT: When will we get the correct document?
>
> MR. KOHL: We were supposed to have it before we started this morning so that we could—
>
> THE COURT: You may have it by this afternoon?
>
> MR. KOHL: I certainly hope so. But essentially as Mr. Long is representing, the parties have agreed delaying acquisition and implementation of certain capital items in order to control the flow and loading from this plant did not result in an economic benefit.
>
> MR. LONG: Your Honor, so the Court is clear, the United States is preserving the argument with respect to economic benefit to other actions that the dairy could have

taken. In other words, we are talking about production or other matters aside from the capital expenditures, as well as the maintenance costs associated with the actual hardware that was brought on-line at the dairy facility.

MR. KOHL: We understand that the government wishes to continue to pursue that.

THE COURT: Okay.

(Tr. at 278–80.)

Joint Exhibit 18 was introduced through David Koontz at trial on January 29, 1996. (Tr. at 172–173.) Fairmont chose not to question Koontz on that document during the United States' case-in-chief. He was not cross-examined by Fairmont but instead was called by Fairmont in its case-in-chief. During Fairmont's examination of Koontz, Koontz was not questioned regarding Joint Exhibit 18. The trial did not conclude until January 31, 1996. Fairmont could have called Ronald Crock, preparer of the document, in its own case-in-chief. In its closing, Fairmont did refer to the $417,000 revenue figure stating that figure was gross revenue not profit. Nothing else was presented for this court to adjust those figures.

 Fairmont seeks relief pursuant to Federal Rule of Civil Procedure 52 or, alternatively, Federal Rules of Civil Procedure 59, 60 and Local Rule 7.10. The purpose of a motion under Rule 52(b) or 59(e) is to correct manifest errors of law or fact or present newly discovered evidence. *Universal Premium Acceptance Corp. v. York Bank & Trust Co.*, 1996 WL 432488 at *4 (E.D.Pa. July 30, 1996). A Rule 59(e) motion may not be used to raise argument that could have been made prior to entry of judgment. *Ferguson v. University of Pennsylvania*, 1996 WL 432491 at *3 (E.D.Pa. July 29, 1996).

 Rule 59(a)(2) allows a court to grant a new trial. Under the law of this circuit, a new trial is appropriate only when the verdict is contrary to the great weight of the evidence or errors at trial produce a result inconsistent with substantial justice. *Roebuck v. Drexel Univ.*, 852 F.2d 715, 735–36 (3d Cir.1988).

Rule 60 allows for relief from judgment based on mistake, inadvertence, surprise, or excusable neglect, newly discovered evidence, fraud, misrepresentation, or other misconduct of an adverse party, that the judgment is void, that the judgment has been satisfied, released or discharged, or any other reason justifying relief.

 Finally, Local Rule 7.10 allows the court to reconsider its order. The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence. *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir.1985), *cert. denied*, 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986). Therefore, a court may properly grant a party's motion for reconsideration where there is the development of an intervening change in the law, the emergence of new evidence not previously available, or the need to correct clear error of law to prevent a manifest injustice. *In re TMI Litigation Cases Consol. II*, 922 F.Supp. 997, 1008 (M.D.Pa.1996) (citing *Cohen v. Austin*, 869 F.Supp. 320, 321 (E.D.Pa.1994).

It is the opinion of this court that Fairmont has failed to meet the requirements for post-trial relief. Fairmont could have called Ronald Crock to explain Joint Exhibit 17 at the time of trial and failed to do so; nor was there any request to the court to seek additional time to do so before closing the trial record in the case.

All other requests for post-trial relief will not be addressed as this court believes its memorandum order of July 10, 1996 is adequately supported by case law.

For the foregoing reasons, **IT IS HEREBY ORDERED THAT** Defendants' post-trial motion is **DENIED**.